Good morning. Athena Roussos on behalf of Appellant George Petroutsas. This case arises under the Hague Convention on the Civil Aspects of International Child Abduction. And under the convention, when a child is wrongfully removed from his country of habitual residence, the court is supposed to order that the child be returned to his habitual residence forthwith. This is designed to prevent forum shopping and to ensure that children are returned to their habitual residence. And so the principal issue in these cases that courts are faced with is determining which country is the country of habitual residence. Here, the district court found that Greece was the habitual residence, and we believe that was error for two main reasons. Did the district court actually make that point? Well, it's actually in the order. It says that the child, I believe, is to be returned to Greece, his country of habitual residence. But did the district court actually engage with that issue? I don't believe so, actually. Did he apply, you know, the standards that our court has adopted under Moses v. Moses? No, I do not believe so. I don't believe that the court actually made Well, what he did was, I understand what he did was he decided to give, you know, respect to the judgment of the Hague court in Greece. Yes, I believe that And the parties seem to be of the view that the Hague court in Greece made a determination about the child's habitual residence. Well, I don't agree with that. Actually, I don't Well, let me ask you this. Did the Greek court actually make a determination of the child's habitual residence at the time it was ruling on that petition? No. If you look closely at the Greek decision, there is nothing whatsoever in that Well, it didn't do that. It seems to me you're quite right, it didn't. No, it did not. What it did do, it appears, is make a determination essentially, and I would like some help on how this fits into the Hague Convention analysis, that the child wasn't wrongfully removed. That's correct. So how does that fit in to the Hague Convention analysis? If the child wasn't wrongfully removed, I know you have other problems with the Greek determination, including procedural ones and also substantive, but just for now, if we were to defer to the conclusion that it wasn't wrongfully removed, where would that get you on a Hague, as to the current issue, which is now we have another abduction and the child's back in the United States and we're trying to decide now where the Hague Convention leaves the child. So how does the earlier determination about wrongful removal fit into that? Okay. Well, first of all, the Greek court, as you mentioned, did not make a finding of habitual residence. It really found exceptions to the rule requiring it to return the child to California. And those exceptions are found in Article 13. They made three findings. One was that there was consent by Mr. Petrusas to the child permanently relocating to Greece, and I think the record is clear that there was no consent. Second, the court found that there was a failure by Mr. Petrusas to exercise his rights of custody. And again, I think the record clearly conflicts with that finding. Those again, those are in Article 13A of the convention. Article 13B, the court also applied that exception. And that doesn't seem proper at all, but given all that, suppose they're totally wrong about that, about all three things. Still, A, if we were to give comedy, does it matter if they're totally wrong? Or is comedy deference or is comedy, you know, capitulation essentially under these circumstances? And B, I still need to know if they were right, where would that lead you? If they were right. Well, let me, I think where we are today, if that court, you know, did not properly decide the issues and it's not entitled to comedy, which I will address, then where we're left today is the child is in his country of habitual residence in the law of the child's habitual residence. And so there does seem to be a problem with that. And I think the court should be able to apply that to some other place. Let me reshape Judge Prezan's question, just take a different spin on it. Does the Hague Convention Court have to decide habitual residence in order to make a determination that the child has been wrongfully removed under the law of the child's habitual residence? The court, yes, the court must apply the law of the child's habitual residence. And so there does need to be a determination of habitual residence. Here, the child's habitual residence is California. The court should have applied California law in determining whether there was consent and in determining whether there was a failure. No, but how about wrongful removal? How about removal? Well, wrongful removal is... I want to hear what Judge Prezan's question is. You know, when you look at this, what the district court did was grant comedy to the finding that, as I understand it, was that the child was not wrongfully removed. Yes. And, I mean, as I said, there were the three stated reasons for that. And I think that the record is clearly conflicts with those findings. Now, as far as... Again, what I want to know is suppose either because of comedy or otherwise we thought it was... we were not going to get underneath that. Where does that lead us with regard to the current situation? Sure. Even if he was... but if he was wrongfully removed, but in fact his habitual residence either hasn't been determined or was in California at that time, but now, meanwhile, there was a determination that in Greece, that he belonged in Greece, and he was in Greece for two years, does that affect the habitual residence question as to the fact that now, as opposed to then, given the fact that he was clearly wrongfully removed, or at least removed without... I don't know what wrongfully is, but he was removed... in terms of what Greece would certainly think he was wrongfully removed at now, this time. Okay. Well, the issue of whether to defer to that decision, I mean, that's one issue under the principles of comedy. And this Court, of course, is not required to defer and enforce the decision of the Greek Court. And I think we've set forth several reasons why we believe that comedy should not be afforded. Now, where we are today, it... there's no... been no change in the child's habitual residence. It is... Well, why not? Because the child has always had... the child was born in California until... The child of five months has lived in Greece for a lot longer, has lived there under color of law in the sense that Greece said it was okay to keep him there at least. In the Moses case, this Court addressed this issue of habitual residence and talked about there can be a situation under certain very narrow circumstances where a child can be acclimated to the new country, even though it's not the habitual residence, and even though there was no shared intent for the child to relocate to that residence. But in Moses, the Court talked about this and used an example of a child who had been somewhere for 15 years. Yeah, but this child has been there for... by far most of his life. Well, the fact that he'd been there most of his life... I mean, in Moses, the Court talked about where there is a settled habitual residence, and here there was. The child was born here, he lived here his entire life until his mother took him to Greece on what was supposed to be a vacation, and he was... you know, he lived here, he had family here, he had plenty of ties here, there was a settled habitual residence here. It takes a lot to change that when there's no shared intention between the parties, and clearly here there was no shared intention. In terms of the larger goal of the Hague Convention, which is to discourage abductions, I mean, here we had a definite abduction the second time around. Whatever ambiguity there may be about the first one, and if one says that all doesn't matter at all, you're certainly not discouraging people from doing that. Well, there are several cases that have addressed that issue. I think this Court's decision, actually, I believe it was Holder v. Holder, which is a fairly recent case, and also the Hague Convention, both of those cases talked about there's only a wrongful removal if the child was removed from the habitual residence under the Convention. The Court has no power to return a child to a country that is not his habitual residence. Dioranou mentioned that when they analyzed this issue. They said that, you know, if the father had taken the child from the United States to Germany, and in that case, this Court analyzed that issue, saying, you know, if Germany was the habitual residence, they had to return the child there, and unless an exception applied, if the United States was, then the child belonged in the United States. And so it turns to circumstances of an intervening Hague Convention decision in the country where the child then lived for several years. In other words, there was a determination that he was properly there. Whether it was a right or wrong one, there was one. So at that point, isn't that relevant to whether he becomes ‑‑ it turns into his habitual residence if he actually lives there on the ground for another two years? Well, you know, first of all ‑‑ Was that the fact in any of these cases? He did live in Greece. No, but I'm asking, in the cases that you're talking about, did that fact exist? Oh, I'm sorry. I.e., that there wasn't ‑‑ it wasn't simply amorphous. There was an actual determination on the ground in the place where he was living that he belonged there. Only in the Dioranou case talked about that. We actually discussed another case, Inns v. Caracossa, but I don't believe that the child had lived for that long in that case. However, here, again, the Greek Court decision, you know, it's not entitled to comedy here. There was a complete failure of due process here. They did not allow Mr. Petrusas to have his attorney that represent his chosen attorney represent him in court. I heard in the state of California, if one of these hate petitions is brought in state court, the local DA brings it. Well, actually ‑‑ Very similar. Actually, the state courts, there's nothing that prohibits parties from having counsel present. And actually, the statute, I believe it's family code 3132, says that the DA does not represent any party in that case. It's really more ‑‑ and that actually only applies where there has been a custody order and there's been a violation of a custody order. And it's important to remember here that Mr. Petrusas obtained custody orders in California. In fact, the only custody orders that were in place at the time of the Hague proceeding in Greece were California orders. And those were orders ‑‑ But what about the Greek custody order? Well, Mr. Petrusas had filed for custody first in California. That was, I believe, at the end of November 2005. Mrs. Vesta then went to the Greek court to seek custody there. And I believe that action was stayed because of the ‑‑ But she got ‑‑ she received a temporary order. Mr. Petrusas, at the end of January, I think it was ‑‑ well, he had a temporary order as well and it eventually became a permanent order, granting him sole custody and ordering the child to be returned to California. The fact that the child remained wrongfully retained in Greece, because there was an abduction here. I mean, we have ‑‑ the mother, she took the child to Greece on what was clearly supposed to be a short vacation. She had expressed consent from Mr. Petrusas for a 30‑day trip. And she decided not to return. That was her unilateral ‑‑ But the day before she was to return was when he sent this message to her that he was filing something that she had absconded with the child and that she would likely be arrested if she returned. Well, there's some dispute in the evidence about that. Mr. Petrusas, what happened was she had contacted him earlier and said she was not going to return, which is why he took the actions that he did. I mean, he acted very immediately to protect his rights as a parent in California. And so ‑‑ but she could have ‑‑ I mean, she could have returned ‑‑ She could have returned and been arrested is what the problem was. Well, that right there is not really grounds for the ‑‑ and the Greek court, you know, didn't base its decision on that fact. I know, but that was the argument you were making. And I'm just saying that there is this intervening thing that I thought was fairly important. Well, again, there is some dispute in the facts about that. But that right there by itself was not a reason for the Greek court to refuse to return the child to the institution. The issue is not to decide who has custody. The issue is which country is entitled to determine custody. And it's the country of the child's habitual residence. California had already granted a custody order. The Greek court completely ignored those orders. And we ‑‑ the California courts were perfectly capable of dealing with these issues, of dealing with these issues between the two countries, making an appropriate custody order here. Now, as far as the fact that Mr. Petrusas took the child out of Greece, I understand that that is worrisome to you. However, legally under the convention, I mean, first of all, he did have a court order granting him rights under California law. He did have sole custody of the child. And he had authority under those orders. But in addition ‑‑ But he also filed the petition for the Hague matter. And so then why doesn't he have to be bound by what was filed there? He filed it. Well, again, foreign orders, he did file it. And that was what he was supposed to do. I mean, it's certainly better that he filed ‑‑ he tried to go through all of the proper venues, including filing a Hague petition. But if you get the results you don't want, then you can ignore it? Well, no. I mean, that's not ‑‑ it's not simply a matter of not getting the right result here. What we have here was the Greek court did not give him a fair trial. The Greek court did not properly apply the convention. I mean, the Greek court had the first opportunity here to do the right thing and return the child. But the fundamental problem is the Greek court did not decide the relevant question. It didn't decide the habitual residence question. That's very true, yes. That's what I find most troublesome. And that's why I keep asking you what is the pertinence of what it did decide, which is that the child was not wrongfully removed. Well, what it decided was that there were exceptions that allowed that court to retain the child in Greece. However ‑‑ I don't ‑‑ if we decide to give comedy, if comedy applies, why doesn't that just trump everything? Well, comedy should not apply here, Your Honor. I think that there are many reasons. And we do have a report here, which was properly in evidence, by the way, from our own government, that this country does not comply with the convention. It treats these matters like custody matters, and it uses the Article 13B exception excessively. And that's exactly what happened here. That information, by the way, was in the declaration of Susan Roehl, which was expressly admitted into evidence. So that ‑‑ I mean, we have recognition from our own government that this country does not comply with the convention. We have the fact that they did not follow basic due process. And under this court's decision in Wilson v. Marchington, when there has been a failure of due process, the court cannot recognize a foreign order that was obtained without due process. And that's actually ‑‑ Your concern with the due process argument is that he wasn't represented by his own counsel? That's correct. And there is a ‑‑ Is that it? That's it, yes. But he also wasn't allowed to testify. Yeah, I mean, that's part of it. But really it was his right to counsel was violated. There is a long line of cases, starting with ‑‑ What would his counsel have done that the state's representative didn't do? Well, you know ‑‑ And do that in the record. So first. That's not really the question. I mean, to be honest, but his counsel was retained several months before this hearing. She worked very hard on the case. She had declarations, she had affidavits to present that were negative. She never filed. And that, I believe, is in her declaration, which was also admitted into evidence. You know, there are a number of things that she certainly would have done. And there is testimony that Mr. Rallis, the government representative, really didn't go into issues of habitual residence, which, again, was the legal issue before the court. What is the current status of the cassation appeal? I believe it is currently still pending. It has not been decided yet. What difference will that make? I don't know. I mean, I'm not sure what the court is going to do with it. I don't know if they would remand it for another decision. The child, you know, I really don't know what the outcome of that appeal, and it's been some time. One other technical question is I gather that there is a provision in Article 12 of the Hague Convention. I'm only getting this from the footnote in the Second Circuit case, that says  a wrongful removal is necessarily dispositive if it's demonstrated that the child is now settled in its new environment. Has that ever been litigated in this case? Well, I don't believe that issue was ever raised. You know, the child was in Greece for some period of time, and there is this exception that the Moses case discusses, but I don't believe that issue was ever raised below. Judge Fogel didn't make a finding on that. And there's really no showing that his case was ever raised. His contacts were settled to the point that his habitual residence had actually changed at that time. How long had he been there when his father brought him back? I believe he had been there just under two years. Just under two years? Yes, I believe so. But I just want to, on this issue of due process, I do want to emphasize that there is a long line of cases stating that parties do have a right to choose the counsel to represent them in court. That's under the Fifth and Fourteenth Amendments of the Constitution. That was clearly denied to Mr. Petrusius. And many cases, including Powell v. Alabama, have held that that is a violation of fundamental due process. In a civil contract? In a civil case. We have a number of cases. The Texas catastrophe property insurance case, I think, is most close to this case, because in that case, the Fifth Circuit struck down a statute saying that this association of insurers had to be represented by the attorney general. The court said that was a violation of due process. They were entitled to the counsel of their choosing, and there was no compelling reason for them to be required to have a government attorney represent them. The legal representative, who was not Hicks's lawyer, didn't file an – there was two kinds of appeals, and she didn't file an appeal as to one piece of it? Yeah. He did not file any sort of appeal of the factual findings. There was no – he blew the statute – I mean, blew the time period on that, apparently. The cassation appeal is a more limited appeal that deals with procedural issues. And another thing here, you know, Mr. Rawless spent very little time preparing for this case with my client. You know, again, he did retain an attorney who worked very hard on this case just a few days before they were told, you can't represent him, you can't say anything in court. And, you know, parties also have a right to consult with their attorneys in court during these proceedings. And that was denied to him as well. When she tried to give some advice to Mr. Rawless, the government representative, she was scolded by the judge. And, you know, we believe that failure of due process right there is reason enough to not recognize the Greek ruling. In conclusion, this is a case where the child's habitual residence has always been in the United States. He should remain here. And this judgment should be reversed. Thank you. May it please the Court, Your Honor. Stephen Cullen for Dispenas Vesta. Judge Berzon, I would like to address immediately one of your questions in the last 20 minutes about whether or not the Greek court was following the procedures that we would follow in this country as set forth, for example, in the Moses case from this ---- I didn't ask you about procedures. I asked whether it decided the habitual residence. Do you agree that it did not decide the habitual residence question? Absolutely not, Your Honor. We do not agree. Where did it decide it? If you look, for example, at page 348, volume 3 of the record, you'll see that the Greek judge goes on to talk about the respondent, Mrs. Vesta, seeking employment and was hired temporarily. These are the very elements that relate to habitual residence. But what I would respectfully state is ---- The child at that point had never been in Greece.    These are the very elements that relate to habitual residence. There is a plethora, to address your question, Judge Berzon, there's a plethora of cases in this country called the sabbatical cases, where this country has repeatedly said temporary moves to foreign countries does not change the habitual residence of a child, for example, if a professor goes for one or two years on a sabbatical abroad. But I would submit the point that is crystally important here is we, under the treaty, leave it to each country's jurisdiction and jurisprudence to establish what they mean by habitual residence. It is not for us to impose on a foreign nation our own interpretation of habitual residence. That would be more comforting if there was any use here of that term or concept, which there doesn't seem to be. There doesn't have to be. There's no requirement under the treaty that the words habitual residence have to be used. And, in fact, the treaty at Article 8 goes out of its way to state that the way these cases are to be pursued is the way that the nation countries decide to pursue them. When this country, the United States, ratified the treaty with the sovereign nation of Greece, it was accepting Greece to do it the way they were going to do it. It's not for us to second-guess the analysis of the equivalent of the district court judge in Greece, because to do that, respectfully, Your Honors, would create complete chaos in the Hague Convention. We accept and cooperate with foreign nations on this treaty. But just to be as to the technical question I'm asking you, the Greek opinion seems to go through three exceptions to habitual residence. He consented, he didn't exercise custody, and there would be severe danger, but it doesn't go through the habitual residence determination. Now, I don't know where that leaves us, but it seems to me it would be at least clarifying to understand that that's what we have here. We have a determination essentially that there wasn't a wrongful removal, but not that Greece was its habitual residence. Is that not so? No, that's not the case, because the matrix of the treaty doesn't require that. There are numerous cases in this country where children have not been returned on the basis of one of the exceptions. I understand that, but that's a different determination from the determination that the child's habitual residence was not in the United States at the time she was brought to Greece. And that determination was never made by the Greek court. It doesn't have to be made, respectfully. I understand that. All right. But if it wasn't made, then we don't have a habitual residence determination to refer to. We have something else to refer to, and I just want to be clear about what it is. No, I understand that, and it may appear at first blush to be somewhat irritating that that isn't there. Our position, respectfully, is that it is there. You can't just look into the Greek written opinion and try to find the words habitual residence because they will not be there. But what you do find, respectfully, Your Honor, is the court saying the time they were going to be in America was always going to be temporary. Now, again, just to pick up your point, Judge Berzon, on the exceptions, the court found that there was consent. There was consent, number one, because there was permission to go to Greece. There was consent, number two, because Mr. Petroutsas sent an e-mail on November 2nd of 2006 saying, Go to Greece, be in Greece, and I will visit the child in Greece. And the Greek court appropriately determined that that was the issue of consent. The third exception was the Article 13b exception, a grave risk of returning the child to the United States. Not returning to this country, but returning to Mr. Petroutsas. As we know, after a valid court order in Greece, we know that the Greek court was right to have that concern because during supervised visitation he grabs the baby, jumps out a window, and flees to Canada in direct violation of a Greek court order. Now, this court really should start at the Greek Hague decision. That is what matters. The Greek court held an impartial hearing. It had subject matter jurisdiction. It had personal jurisdiction. Let me ask you, there was one thing I didn't see in the record, and maybe it's there, and I just didn't catch it. Does Greece have a set of laws that govern how the Greek courts are to apply the Hague Convention? Yes, Your Honor. In fact, in the record at page 347, it talks about the Greek Hague Convention, so to speak, and the implementation of certain articles being ratified by the Greek Act 2102-1992. Okay. Is that Greek Act? Yes. In the record? Yes. Where? The actual statute? Yes. It's in the affidavits of the Greek lawyers. There are four different – But the statute itself is not in the record translated into – No. Correct. The statute itself, it is referenced in the Greek affidavits. Right. It's referenced, but we don't have the verbatim – No. And very respectfully, you don't need to, Your Honor. Why not? Because you have Article VI of the United States Constitution that tells us that we are to respect – It would be nice to know, to look to see how the Greek court was to follow its own law and to see whether it did. Well, then you're getting away from what you're supposed to do in terms of comity. It is not the function, respectfully, of this court to act as an appeal court to the Greek appeal. So is the comity – that's my next question. So does comity mean that as long as, A, there are procedurally, you know, not basically unfair, which I want to talk about in a minute, and, B, we're purporting to apply the Hague Convention, we just accept whatever they said? I mean, is that the bottom line? And I don't mean to be pejorative. I mean, is that really what comity means? Or does comity involve some ability to determine whether they were simply not applying the Hague Convention as written and we don't need to defer to them? Especially – I mean, and there is this document in the record that says Greece seems to be doing somewhat systematically what it may have been doing here. Does that matter? When you say the document in the record, Your Honor, the document from the Greek court or – No, the document of the – demonstrating the – Oh, the patterns of non- The report demonstrating, yeah. Right, the patterns of non-compliance letter. Let's deal with that. This country has been found to be non-compliant with the Hague. Repeatedly. In the case of Dynapur versus Maclary, it was so serious when the district court judge didn't make a decision for 18 months that two diplomatic notes were exchanged with Sweden. Does that mean that we just throw out the treaty? Of course not. There are patterns of non-compliance in every country that applies this treaty. The treaty says, for example, Your Honor, the aspirational goal is that these cases are handled from start to finish in six weeks. Because of the huge caseload in this country, that's impossible. So America, every six years, is found to be non-compliant on that article. But that doesn't underline the wonderful nature of this treaty, which creates a level playing field. Mr. Petruzza's – All right. So what about my first question? If we wash out that, does commonly mean that we simply accept the answer they gave no matter what? No. It is not no matter what. The restatement third of foreign relations lays out two mandatory analyses that this court must make. First of all, was the tribunal impartial? Secondly, did the court have subject matter and personal jurisdiction? Well, there's no question that those two mandatory elements were established. Mr. Petruzza's brought the case. Then the question becomes one under the Hilton v. Guyot case from 1895 from the United States Supreme Court. Did he get due process in Greece? Well, again, respectfully, Your Honors, it is not for us to second guess the way the Greek court runs its Hague cases. England, for example, Scotland, even Ireland, doesn't allow people to testify live. People testify by affidavit. Affidavit evidence – What if the appeals court – and apparently one justice feels that way – what if the appeals court finds that due process was not followed? Then where does that leave us? Does that leave us with a situation where there is a finding that due process was not followed and therefore we don't have to give credence to that Hague resolution in Greece? Your Honor, I believe that is accurate. If this court were to find that there were some serious violations of due process, but not due process as we may require it, due process as is – I think Judge Huggins is asking about this court. He's asking about the Greek Cassation Appeal. Well, the Greek Cassation Appeal – if the Greek Cassation Court decided that there was some procedural error, because that's all it can decide in the Greek first-level court, then it would remand the case to the Greek court in Piraeus. That's what the Greek Cassation Court would do. Then that begs the question, well, let's say then we get a decision in Greece that the child should be returned to the United States. Where does that leave this court? And is that then a question of mootness? Because what happens if the child is in Greece at the time? And, in fact, just because you've raised that question, Judge Huggins, there is a case directly on point from the Fourth Circuit on that called Fawcett v. McRoberts, I want to go back. If the Greek Supreme Court finds that procedurally the action that was done by the lower court there was an error, then would the United States court be obligated to give credence to that lower court decision? Yes, it still would, because we have a final order. We have a final order from the Greek Hague Court. Yes, but it isn't final if there's a Cassation appeal. Yes, it is, Your Honor. It is final. All the evidence submitted at the trial level and all the affidavits and even the appellant's expert agree that the Greek Piraeus Hague decision is a final decision. And there's no evidence that anyone — But subject to the Cassation appeal, correct? Subject to a Cassation appeal. And, in fact, we see from that that Greece provides even greater due process than this country does. There's no question about that. You can bring a Cassation appeal at any time. It's a final order, but not if the Greek Supreme Court says it isn't final. Not to quibble with semantics, but my respectful position on that is it's a final order as long as it's a final order. And it is right now a final order. Well, maybe today it's a final order, but if the Greek Supreme Court were to hand down the decision, let's say, next week, vacating and remanding to the court of first instance, then it's not final. That's true, but that could happen. And in that instance, what happens? In that instance, the Greek Hague case gets retried because that's the correct place for this decision to be made. We then say, well, at that point, there is no Greek decision to defer to, so we now start over again. Here. No, we start over again in Greece because Mr. Petroutsas must bring his Hague case in Greece. That's where the child was located. He can't bring a Hague case in the United States. But he doesn't need to. I mean, at that point, it seems to me we have nothing to give comedy to, so we therefore determine, based on current circumstances, what the situation is. Well, in those circumstances, the current state of the law in this state is that Mr. Petroutsas was ordered to mediate custody and visitation in Greece. So that's what he'd have to do. Well, they could always go back to the superior court and ask to modify that now that the child is here. He could. He could, indeed. But none of this — Is the child here or in Canada, by the way? The child right now is in Greece. In Greece? Yes. I thought he was here. No, in Greece. The — pending this court's decision, Judge Fogel entered an order under the ICARA statute 11604, provisional remedies, and the baby is doing three months in Greece, three months in America, three months in Greece, three months in America. So that's — Your answer that it is in Greece, it just happens to be it's a three-month period. That's correct. Right now, as of today, Your Honor, he is in Greece. It would seem to me that if the cassation appeal is successful, when Ms. Avestis filed her petition here, the district court had jurisdiction because the child was here. No, Your Honor, because the allegation in Mr. Petroutsis' Hague Convention petition was that the child had been wrongfully removed and retained in Greece. So the Hague case has to be brought in Greece. The Hague case had to be brought where the child was located. Following an allegation of wrongful removal or wrongful retention. Not just wherever the child happens to be, because there has to be a change in geography. But none of this gets us to the crux of this case, which is we have a Greek Hague decision. The cassation case could take years. Years. And so — I assume that you have all exhausted any mediation possibilities. But have you actually tried mediating with the help of the mediation unit in this court, which is really quite terrific? Not with this court. And that, of course, is really the key question, despite all the law, Your Honor, because these are desperately tragic cases. You have two parents who want to have the child 100 percent. Are you, of course, trying to mediate once more with the help of the mediation office in this court? Well, I can — we would never say no to mediation, of course. I can tell you that Judge Fogle spent an inordinate amount of time attempting to mediate this. And I would submit, and I'm speculating somewhat here, but his attempt to have the child going backwards and forwards was a further attempt to try to facilitate mediation. I mean, the problem is, as we saw in the case cited by Learned Counsel for the appellants on the Inez case from New Jersey, we have a child in Spain right now, and neither parent sees the child. And these are desperately, desperately difficult cases. But that's why clarity in the law and clarity with respect to comity and issue preclusion must give a result. This court should be encouraged with respect to the issue of what happens to the child, Judge Berzon. This court should be encouraged that the Greek court has said, regardless of Mr. Patroutsas violating our Hague decision, and then he entered a consent order for visitation in Greece. So our position, as you know, is he waived anything after that. He submitted to the Greek custody court. Despite all of that, the Greek court has said he will get meaningful access to his son in Greece, regardless of the fact that he abducted the child from our sovereign nation, which our submission is that's much more than he would get in this country. He would probably only get supervised visitation here after an abduction. So desperately sad cases, but the law is clear, Your Honors. Comity should be granted to the Greek decision. Judge Fogle's decision should be affirmed. The right place for any further custody decisions is Greece, and Mr. Patroutsas will have access to his son in Greece. The one thing is just my observation. All this technicality about the Hague Convention and who wrongfully did this or that, I think the most reasonable sort of thing is what Judge Berzon asked about. Can't something be resolved through a mediation approach? It's just ridiculous to be having all this technical matter determining something that's very important for the child. Judge Hogg, it is terribly important for this child to have meaningful time with both his parents. No one disputes that. And the luxury we have right now, the luxury is the child is young enough so he can spend time in both countries, but we're rapidly reaching the point where he's going to have to start school in one or other country, because we can't split him in two and have him half here and half there. But just so the record's clear, I would absolutely want to continue to mediate this case if at all possible, as would Mrs. Vesta. How can we do that? Well, in Innis, you probably don't want to hear this, Your Honors, but in Innis all the judges ended up sitting in Barcelona around a table trying to negotiate it, the American judges and the Spanish judges, and they are doing that right now. And I believe this case is a case that should be mediated. And since you're putting me on the spot, my position would be that Judge Fogel would be the person to do it. We have a mediation office, a unit, a group of very talented mediators. They're quite talented, and they're incredibly successful in really hard cases often. Then we should do that. I'm happy to return to San Francisco any time, Your Honors. Thank you. Thank you. You had a ‑‑ I believe he exhausted most of your time, but I'll give you a minute. Do you have a reaction for mediation? Yes, we would be happy to mediate. You know, I just want to mention that there are criminal charges pending against my client in Greece. Under the access order that was mentioned, my client is supposed to have a week with the child in Greece during the three-month period that he's there, and he's totally unable to go to Greece because there are criminal charges pending against him. And so that would have to be resolved if there was some sort of, you know, issue. Would you object to mediation with our mediation unit? As Judge Bergelin said, it's been highly acclaimed and very successful. Yes, we'd be happy to, absolutely. I've participated in mediations with the Ninth Circuit, and, sure, we believe this is a case, you know, that should be settled. If it can. To explore that one moment further, is there any chance of getting both the parents here if we were to do that? It seems to me it's unlikely to work if they're not. You know, my client is here, so obviously that's not an issue, but, you know, that would be up to Ms. Esvesta. If I can just make a couple of points in rebuttal. First of all, I want to address this issue of consent about the November 2 email. That was a very vague email, and it was in the context of the parties discussing Ms. Esvesta's trip. And anything else that happened the next day. Right, okay. But the hard problem for us is, assuming that we would not agree with anything that was in this Greek order, do we still have to refer to it? No, and comedy is not a matter of absolute obligation. The Court does not rubber stamp orders of foreign courts just because a foreign court made that decision. And the Court is entirely proper for the Court to look very carefully at the decision, to see if it was a proper decision, to look very carefully at the procedures and, you know, the entire record. Doesn't it have to be true that if we don't think the procedures were fundamentally unfair that we have to defer to it? No. Because otherwise it becomes a meaningless concept. If we start saying, well, you know, in fact, they're wrong about the consent, and not only that, he really was exercising his custody. And not only that, they misapply the severe danger rule. Then the whole comedy thing goes up in smoke at that point. Well, comedy works both ways. The Greek court here did not respect the convention and did not properly apply it. And in Hilton v. Goyot, the Supreme Court said that comedy is not a matter of absolute obligation, that courts may recognize decisions of other courts, of foreign courts, if a number of ‑‑ there's a number of factors there. There has to be an impartial trial, a fair trial under a system of justice that is likely to ‑‑ a system that is likely to secure an impartial administration of justice. I'm sorry? Being right or not even being very wrong is not one of the considerations. Well, you know, the court talks about ‑‑ or any other special reason why the decision should not be recognized. That list is not exclusive. There is ‑‑ you know, there's some room for the court to look carefully. And in the Diorano case, which is the one Federal case that we have where there was a foreign decision, the court looked very carefully at those findings and found that ultimately the findings were reasonable. And, you know, that is not ‑‑ I believe that that's not the case here. Thank you. Thank you. We appreciate your arguments. The matter is submitted. Thank you.
judges: Hug, Paez, Berzon